NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

OTTO KRUPP,                                 :
                                            :        Civil Action No. 13-7442 (MAS)
                                            :
                    Plaintiff,              :
                                            :
            v.                              :        **OPINION**
                                            :
DR. ABU AHSAN, et al.,                      :
                                            :
                    Defendants.             :

APPEARANCES:

        OTTO KRUPP, Plaintiff pro se
        #62709/ SBI 257154A
        New Jersey State Prison
        P.O. Box 861
        Trenton, New Jersey 08625

**SHIPP**, District Judge

Plaintiff, Otto Krupp, a state inmate currently confined at the New Jersey State Prison in Trenton, New Jersey, seeks to bring this action *in forma pauperis*. Based on Plaintiff's affidavit of indigence and prison account statement, the Court will grant Plaintiff's application to proceed *in forma pauperis* ("IFP") pursuant to 28 U.S.C. § 1915(a).

On August 4, 2014, Plaintiff filed a motion for leave to file an Amended Complaint. (ECF Nos. 3, 3-4.) Because no answer has been filed, the Court grants Plaintiff's motion as of right. *See* Fed.R.Civ.P. 15(a)(1). Accordingly, this Court must review the Amended Complaint (ECF No. 3-4), pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, to determine whether it

should be dismissed as frivolous or malicious, for failure to state a claim upon which relief may be granted, or because it seeks monetary relief from a defendant who is immune from such relief. For the reasons set forth below, the Court concludes that Plaintiff's Eighth Amendment claims asserting unconstitutional conditions of confinement and denial and/or delay of medical care should proceed at this time. However, Plaintiff's denial of access to the law library claim against Defendant Burack, and the supervisor liability claim asserted against Defendant D'Ilio, should be dismissed without prejudice at this time.

## I. BACKGROUND

Plaintiff, Otto Krupp ("Plaintiff"), brings this action pursuant to 42 U.S.C. § 1983, alleging a violation of his constitutional rights. Plaintiff names Dr. Abu Ahsan, Rutgers University Behavioral Health Care, Dr. Pease, Ms. Burack, Correctional Officer Daniel Powell, and Warden Stephen D'Ilio (incorrectly identified as Stephen Dielio), as Defendants in this matter. (ECF No. 3-4, Am. Compl. at ¶¶ 4 through 9.)

Plaintiff alleges that he was transferred to a detention unit at New Jersey State Prison ("NJSP") on October 21, 2010, pending a charge of using marijuana while on parole. While there, Plaintiff had to surrender his personal items, including shower shoes, towels, clothing and hygiene products. He complains that he was forced to shower barefoot, with no towels or soap, and then put on soiled clothes afterwards. Plaintiff also alleges that he was not permitted to have a spoon, fork or cup, toothbrush, toothpaste, pillow, blanket and toilet paper in the detention unit. Plaintiff also generally complains that he was mistreated during sick calls, such as being removed from his wheelchair and thrown in the back of a car. (*Id.* at pp. 4, 5.)

In Spring 2011, after being released from administrative segregation, Plaintiff became ill. On April 5, 2011, Plaintiff went on a sick call visit complaining of a dry, itchy and burning rash

2

on his arms and legs. The itching was so intense that Plaintiff would scratch until he bled. He was treated for dry skin. On May 20, 2011, Plaintiff had another sick call and was given prednisone for his dry skin. His condition became worse, with open sores and boils over his body. Plaintiff told the medical staff on sick call that he thought he might have MRSA.[1] On May 27, 2011, Plaintiff was given "mystatin triamcinolone" cream. On June 3, 2011, Plaintiff complained about his open sores and boils at his sick call, and said he believed he had MRSA. (*Id.* at 5.) The medical staff noted Plaintiff's chart and gave him selenium sulfide. Plaintiff again went to sick call on June 4, 2011 and June 30, 2011, and was prescribed prednisone without examination. Defendant Dr. Abu Ahsan saw Plaintiff on July 22, 2011 and July 27, 2011, and gave Plaintiff more prednisone for his chronic rash. On July 28, 2011, Plaintiff was admitted to the infirmary and treated for scabies. Plaintiff was released from the infirmary on July 29, 2011, despite no relief from the treatment. On August 18, 2011, Plaintiff complained to Dr. Ahsan that he had MRSA, but Dr. Ahsan treated Plaintiff for scabies. On August 31, 2011, Plaintiff awoke in the night due to extreme pain and was admitted to the infirmary. On September 2, 2011, after x-rays were taken, Dr. Ahsan told Plaintiff there was no need for Plaintiff to stay in the infirmary. Plaintiff was still in so much pain that he could not walk. (*Id.* at 6.)

On September 5, 2011, the unit officer notified the unit nurse that Plaintiff had not eaten since September 2, 2011, and had remained in bed in a fetal position moaning since that time. Plaintiff was returned to the infirmary. Plaintiff continued in pain and had a running fever. Plaintiff states that he had to be "straight cathed" because he could not walk. (*Id.* at 7.) X-rays

---

[1] "MRSA" is the acronym for Methicillin-resistant Staphylococcus aureus, which is an infection caused by a strain of staph bacteria that is resistant to many antibiotics. *See* www.webmd.com.

were taken, showing mild arthritis. On September 10, 2011, a lab report allegedly shows that Plaintiff had MRSA and was resistant to "oxacillin." Plaintiff admits that he did not have access to the x-ray or lab reports at that time. (*Id.*)

Plaintiff alleges that Dr. Ahsan continued to treat Plaintiff for arthritis and Dr. Ahsan's delay in treating Plaintiff for MRSA caused Plaintiff permanent injury and confinement to a wheelchair. Plaintiff further alleges that he has asked for an MRI but his requests have been ignored. Plaintiff complains that he is being treated as if he is "faking," and is mocked if he screams or cries in pain. (*Id.*) Plaintiff states that he weighed 190 lbs. when he entered the infirmary and by the end of October, will weigh less than 100 lbs. He has lost use of his lower extremities. Plaintiff is forced to sit in a chair, and is physically lifted from his bed to the chair by inmate porters. (*Id.* at 7, 8.)

On September 11, 2011, for instance, Nurse Brown put Plaintiff in a chair and left him there. Plaintiff states that he threw himself on the floor after a half-hour when no one returned to put him back in bed. Nevertheless, Nurse Brown wrote in Plaintiff's chart that he had been in his chair for three hours. On September 15, 2011, Nurse McCourt put Plaintiff in a chair and promised to return in 15 to 30 minutes. She did not return and wrote that Plaintiff had remained in his chair for five hours, even though Plaintiff had fallen from his chair after 20 minutes. Once he reached his bed, Plaintiff used the call bell for help but was ignored. Plaintiff states that he told the nurses that he would not get in the chair anymore, and if the inmate porters put him there, he would throw himself to the floor as he had done previously. (*Id.* at 8.)

Plaintiff's condition allegedly advanced to a "vegetative state," and Plaintiff could not even lift himself up to take medication. (*Id.* at 9.) On September 28, 2011, Nurse Wood asked Plaintiff how to move him and he told her he was in too much pain to be moved. Defendant

4

Powell told the nurse to have Plaintiff lifted to a chair because Plaintiff always complained of pain for no reason. After Plaintiff told Powell that Powell had no medical training and authority to give medical orders, Powell "harassed" Plaintiff for the next two years while Plaintiff remained in the infirmary. (*Id.*) During these two years, Powell allegedly would go in Plaintiff's cell while Plaintiff was in physical therapy or at the hospital, and Powell would take some of Plaintiff's personal property. For instance, Powell allegedly took a bag of coffee, bag of iced tea, various toiletries, clothing, mirror, medication, puzzle books and legal papers. Powell also refused to contact the psychology department for Plaintiff on January 28, 2012. Because prisoners in the infirmary do not receive state pay, Plaintiff could not purchase a toothbrush, toothpaste, denture adhesive, deodorant, shampoo, etc. When a social worker offered to get these items for Plaintiff, Powell interfered and said that these hygiene items were unavailable. Powell also restricted a visit from Plaintiff's brother on one occasion, limiting an hour visitation to only 15 minutes. (*Id.* at 9, 10.)

Plaintiff next alleges that Dr. Ahsan exhibited deliberate indifference to Plaintiff's medical condition by writing inconsistent notes in Plaintiff's medical chart. For instance, from September 26 to 28, 2011, Dr. Ahsan noted that Plaintiff was well-nourished, but on September 29, 2011, he wrote that Plaintiff had a low–intake. Dr. Ahsan also noted that Plaintiff was lying in a vegetative state and then state that Plaintiff's condition was improving. Plaintiff further alleges that Dr. Ahsan never took Plaintiff's vital signs or used a stethoscope when examining Plaintiff. On October 14, 2011, Dr. Ahsan recorded Plaintiff's respiratory condition as good, but the next day, on October 15, 2011, Plaintiff was rushed to the hospital for respiratory failure. Plaintiff states that his condition was so dire that his brother had to be contacted to approve an emergency operation. Plaintiff alleges that his condition had worsened due to the delay in

5

treatment, which delay caused the infection to spread to his spine. (*Id.* at 10.) On October 19, 2011, an operation was performed. Plaintiff states he was told that an MRI showed significant osteomyelitis and spinal cord compression with progressive back pain and lower extremity weakness.[2] After surgery, Plaintiff was returned to prison the next day, and was placed on IV antibiotics from October 20, 2011 through mid-December 2011. (*Id.* at 11.)

On December 1, 2011, Plaintiff states that his rash returned but no one seemed to be concerned except Plaintiff. The rash and blisters spread to Plaintiff's right hand. On December 20, 2011, Plaintiff asked that his catheter be removed because of pain. Plaintiff learned that the catheter should have been removed months earlier, on October 25, 2011. (*Id.*)

On January 16, 2012, Plaintiff noticed discharge coming from an abscess on his back, and reported same to the shift nurse. The shift nurse told Plaintiff there was no drainage from his back, and that it was no more than normal. Plaintiff told Dr. Ahsan, who told Plaintiff to let him know if it got worse. Dr. Ahsan allegedly did not examine Plaintiff. Plaintiff then asked the second shift nurse to look at Plaintiff's back, and Plaintiff was told that he had a small lump. The next day, January 17, 2012, Plaintiff again complained about his back to Nurse Cook and Dr. Ahsan. On January 18, 2012, a lab report showed that Plaintiff's infection was resistant to "oxicillin." (*Id.* at 12.) That same day, Plaintiff again told Dr. Ahsan about the abscess on his back. Dr. Ahsan purportedly "glanced" at Plaintiff's back and told Plaintiff that "if it takes a turn for the worse, it will be addressed." (*Id.*) That afternoon at therapy, Plaintiff's therapist noticed that the abscess had drained through Plaintiff's shirt. Dr. Ahsan was notified that Plaintiff's condition was worse. The next few days Plaintiff was placed on IV antibiotics with a

---

[2] Plaintiff states that parts of his spine had to be removed and it took 37 staples to close his wound, which healed by November 1, 2011 when the staples were removed.

medical order that his bandage be changed twice daily. Plaintiff alleges that his bandage was not changed as directed and that when it was changed, he was exposed to cross-contamination. (*Id.*) In addition, Plaintiff alleges that nursing care was "poor and indifferent." For instance, only a couple nurses could take blood or give medication without "blowing" Plaintiff's veins. (*Id.* at 13.)

On February 2, 2012, a medical report allegedly showed evidence of re-infection and other spinal issues, including "persistent ventral epidural abscess at L1-L2 level." (*Id.*) A February 14, 2012 lab report allegedly confirmed "heavy growth diphtheroids." (*Id.*) Plaintiff states that he was not aware of these reports until August 2013. (*Id.*)

Plaintiff states that for the next seven to nine months he continued to suffer pain and numbness in his feet and lower extremities. He would complain to Dr. Ahsan, who would set up appointments with general surgeons. Plaintiff alleges that the general surgeons could not do anything because Plaintiff's medical problems were "not their field." (*Id.*) Dr. Ahsan refused to schedule Plaintiff to see the surgeon who performed Plaintiff's previous operation because the doctor's office was in Pennsylvania. On March 16, 2012, Dr. Ahsan allegedly told Plaintiff that Dr. Pease would not see Plaintiff because he did not operate on Plaintiff. However, when Plaintiff's condition worsened requiring another operation, Dr. Ahsan scheduled Plaintiff to be examined by Dr. Pease on September 4, 2013, so that Dr. Pease could deny surgery. (*Id.* at 13, 14.)

Plaintiff states that Nurse Milroy continually informed Dr. Ahsan that Plaintiff's wound was not healing, and that the infection was tunneling, with pain radiating to Plaintiff's groin, thigh and knee. Plaintiff alleges that Dr. Ahsan ignored these reports. On November 12, 2012, Dr. Christine Barton wrote that Plaintiff had extensive fluid enhancement and possible abscess

formation in the muscle with "sequela of osteomyelitis multifocal spondylosis significant spinal stenosis." (*Id.* at 14.) Plaintiff contends that, due to this delay in treatment, Plaintiff lost his ability to walk. Further, Plaintiff alleges that antibiotic treatment with vancomycin was found to be toxic to Plaintiff, causing the onset of "nephrotoricity" with swollen lips, blisters and low blood pressure. (*Id.*) Plaintiff alleges that Dr. Ahsan showed no regard for Plaintiff's discomfort and worsening condition. (*Id.*)

Eventually, Plaintiff underwent another operation on November 12, 2012,[3] leaving Plaintiff with an open incision for a wound "vac" to be inserted for healing purposes. (*Id.* at 14.) Plaintiff states that the diagnostic reports that followed showed "dismal" recovery. (*Id.*) Namely, a December 17, 2012 report noted "chronic destructive vertebral changes at the L1 and L2 level. Protrusion of the T6-T7 dis[c] .... Persistent surgical wound drainage; persistent osteomyelitis; spinal stenosis; abscess formation in the muscle." (*Id.*) The conclusion reached by Dr. Fares and Dr. Bidros was that Plaintiff "had poor wound care." (*Id.* emphasis in original.) Plaintiff was prescribed Vicodin for his pain every 4 hours when he was returned to prison after surgery. Nurse Mitchell noted that Plaintiff continued to complain of pain despite the Vicodin prescription. On January 12, 2013, another surgical procedure was performed to remove fluid collection. A sling was recommended for shoulder injury, but it was never provided. (*Id.* at 15.)

Plaintiff states that a recommendation was made for him to be transferred to a tertiary center after drainage of several abscesses, but it was agreed that long-term IV antibiotics be administered first and once infection was lowered, Plaintiff would be sent to a tertiary center for

---

[3] Although the Amended Complaint reads November 12, 2013, a chronology of events after the surgery shows 2012 dates, suggesting that 2013 was written by Plaintiff in error.

removal of vertebral body. However, Plaintiff alleges that this surgical procedure has been denied. He also alleges that wound care has been sporadic and that Dr. Ahsan reduced his pain medication despite Plaintiff's continued complaints of pain. *(Id.)*

Plaintiff further alleges that, on February 25, 2013, Dr. Ahsan showed deliberate indifference to Plaintiff's pain and suffering by re-suturing Plaintiff's "Pic line" without first numbing the area and ignoring Plaintiff's screams of pain. *(Id.* at 16.) On April 28, 2013, Plaintiff complained of increasing pain and numbness in his feet, and burning sensation in his hands, face, neck and shoulders. On May 13, 2013, Dr. Ahsan finally prescribed nerve medication but decreased Plaintiff's pain medication even though Plaintiff complained of increasing pain. On May 21, 2013, Plaintiff was unable to stand due to pain and weakness in his legs. He states that he also was denied "HEP C" treatment due to his age. On May 24, 2013, Plaintiff's wound re-opened and he suffered an episode of hypotension. On June 3, 2013, a lab result confirmed that Plaintiff tested positive for a staph infection. *(Id.)*

On June 9, 2013, Plaintiff developed a lump in the area where his wound drainage bag was inserted. Plaintiff alleges that no one noticed because his wound dressing had not been changed for a period of time contrary to direction. Plaintiff informed Dr. Ahsan about the lump on June 10, 2013, who allegedly told Plaintiff that the lump did not need to be lanced. Plaintiff complains that Dr. Ahsan continued to deny treatment even when he saw Plaintiff's boil rapidly grow larger and Plaintiff spiked a fever. Then Dr. Ahsan allegedly told Plaintiff the boil had become too large to lance. Plaintiff states that he begged the nurses for hot compresses to ease the pain, but his requests were denied. Plaintiff states that, on June 16, 2013, he and an inmate porter caused the boil to break early, resulting in a large amount of discharge over his bed. A June 16, 2013 lab report showed that Plaintiff had MRSA, which made it impossible for him to

9

get treatment because one nurse already had been hospitalized for MRSA after having helped Plaintiff. (*Id.* at 17.)

On August 30, 2013, Plaintiff was discharged from the infirmary. Dr. Ahsan scheduled Plaintiff to be examined by Dr. Pease on September 4, 2013, who denied Plaintiff an operation recommended by Plaintiff's earlier doctors, Drs. Bidros and Fares. On July 2, 2014, Plaintiff was returned to St. Francis Medical Center, where Dr. Pease allegedly told Plaintiff that nothing could be done for him and that Plaintiff would have "to endure the infection, pain and incapacitation for the rest of [his] life." (*Id.* at 18.) Plaintiff contends that this factual summary demonstrates that he was denied adequate medical care in violation of his constitutional rights. (Id.)

Plaintiff next asserts that he was denied legal access because he was confined to the infirmary for so long where he had limited access to the law library and inmate paralegals. Plaintiff had made 16 requests for legal calls within an eight to nine month period. He states that he had a legal action dismissed due to lack of access, and that he had a default entered in one case and has not been able to get a default judgment without the help of an attorney. He further states that he has been working on this action for eight months because it takes time to get legal access, copies, etc. From September 6, 2013 to November 20, 2013, Plaintiff had only two and a half hours in the law library. (*Id.* at 19, 20.)

Finally, Plaintiff alleges that for more than two years, while he was housed in the infirmary, Defendant Powell deprived Plaintiff of basic hygiene necessities like toothpaste, toothbrush, shampoo, shower shoes, and nail clippers. He was unable to eat with his teeth during this time because he did not have the money to purchase dental adhesive until he was loaned

some money.  Plaintiff also was billed for legal postage and copying costs even though he does not receive any state pay due to his confinement in the infirmary.  (*Id.* at 20.)

Plaintiff seeks $25 million in compensatory and punitive damages, and asks that the prison law library hours be extended to nights and weekends.  (*Id.*, Prayer for Relief at ¶¶ 17, 18.)

## II. STANDARDS FOR A SUA SPONTE DISMISSAL

The Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, §§ 801-810, 110 Stat. 1321-66 to 1321-77 (April 26, 1996), requires a district court to review a complaint in a civil action in which a prisoner is proceeding *in forma pauperis* or seeks redress against a governmental employee or entity.  Specifically, the PLRA directs the district court to screen the complaint for cognizable claims and to *sua sponte* dismiss any claim that is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.  28 U.S.C. §§ 1915(e)(2)(B) and 1915A.  This action is subject to *sua sponte* screening for dismissal under both 28 U.S.C. § 1915(e)(2)(B) and § 1915A.

The Supreme Court refined the standard for summary dismissal of a complaint that fails to state a claim in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Citing its opinion in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) for the proposition that "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555), the Supreme Court held that, to prevent a summary dismissal, a civil complaint must now allege "sufficient factual matter" to show that the claim is facially plausible.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)(citing *Iqbal*, 556 U.S. at 676).  *See also Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012)

("The touchstone of the pleading standard is plausibility. ... "[A]llegations that are no more than conclusions are not entitled to the assumption of truth; ... [a court should] "look for well-pled factual allegations, assume their veracity, and then 'determine whether they plausibly give rise to an entitlement to relief.'") (citations omitted).  In short, "[a] complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts." *Fowler*, 578 F.3d at 211 (citing *Iqbal*, 556 U.S. at 678-79).  Thus, while pro se pleadings are liberally construed, *Higgs v. Atty. Gen.*, 655 F.3d 333, 339 (3d Cir. 20011), "pro se litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (citation omitted).  Nonetheless, courts must be cognizant that the *Iqbal* standard "is not akin to a probability requirement." *Covington v. International Association of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 679).

## III. SECTION 1983 ACTIONS

Plaintiff brings this action pursuant to 42 U.S.C. § 1983.  Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ... .

Thus, to state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

12

## IV. DISCUSSION

### A. Denial of Access Claim

It appears that Plaintiff may be attempting to raise an access to the courts claim against Defendant Jane Doe Burack, who is the head of the law library and in charge of legal services at NJSP. (*See* ECF No. 3-4, Am. Compl. at ¶ 7.)   Indeed, Plaintiff asserts that law library hours have decreased from 49 hours per week to 22 hours per week, while inmate population has increased.

"Under the First and Fourteenth Amendments, prisoners retain a right of access to the courts." *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008) (citing *Lewis v. Casey*, 518 U.S. 343, 346 (1996)).   "Where prisoners assert that defendants' actions have inhibited their opportunity to present a past legal claim, they must show (1) that they suffered an 'actual injury'—that they lost a chance to pursue a 'nonfrivolous' or 'arguable' underlying claim; and (2) that they have no other "remedy that may be awarded as recompense" for the lost claim other than in the present denial of access suit." *Id.* (citing *Christopher v. Harbury*, 536 U.S. 403, 415 (2002)).   Thus, to satisfy the requisite pleading requirements, "[t]he complaint must describe the underlying arguable claim well enough to show that it is 'more than mere hope,' and it must describe the 'lost remedy.'" *Id.* at 205–06 (footnote omitted) (citing *Christopher*, 536 U.S. at 416–17).

In this case, Plaintiff fails to state an access to the courts claim against Burack as he does not allege any arguable claim that he lost the chance to pursue due to being given inadequate access to the prison law library.   At best, he alleges without specificity that he had a legal action dismissed and a default entered in a case where he has been unable to pursue a default judgment. Plaintiff fails to identify these general claims or show that these purported claims fall within the

13

type of claims constitutionally protected under *Lewis*, 518 U.S. at 355 and *Bounds v. Smith*, 430 U.S. 817, 828 (1977).[4]  Accordingly, this denial of access to the law library claim is dismissed without prejudice for failure to state a claim at this time.

B. Conditions Claim

Next, Plaintiff alleges that Defendant Powell denied Plaintiff basic hygiene items for two years while Plaintiff was confined in the infirmary.  The Court construes this allegation as asserting an Eighth Amendment conditions of confinement claim.

The Eighth Amendment requires prison official to provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must "'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)).  A prisoner asserting a condition of confinement claim must show that the alleged deprivation is "sufficiently serious" and that he has been deprived of the "minimal civilized measure of life's necessities." *Id.* at 834 (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). These minimal civilized measures of life's necessities include food, clothing, shelter, sanitation, medical care and personal safety. *See Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 256 (3d Cir. 2010) (citations omitted).  Plaintiff also must allege that the prison official acted with

---

[4] In *Bounds*, the Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds*, 430 U.S. at 828.  The right of access to the courts is not, however, unlimited. "The tools [that *Bounds*] requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Lewis*, 518 U.S. at 355 (emphasis removed).

deliberate indifference to the Plaintiff's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 298–99 (1991). Thus, "'the official must both be aware of facts from which the inference could be drawn that a substantial harm exists, and he must also draw that inference.'" *Wilson v. Burks*, 423 F. App'x 169, 173 (3d Cir. 2011) (per curiam) (quoting *Farmer*, 511 U.S. at 837). In analyzing whether the conditions of confinement violate the Eighth Amendment, a court examines the totality of the conditions at the institution. *See Nami v. Fauver*, 82 F.3d 63, 67 (3d Cir. 1996). "Relevant considerations include the length of confinement, the amount of time prisoners must spend in their cells each day, sanitation, lighting, bedding, ventilation, noise, education and rehabilitation programs, opportunities for activities outside the cells, and the repair and functioning of basic physical facilities such as plumbing, ventilation, and showers." *Id.* (citing *Tillery v. Owens*, 907 F.2d 418, 427 (3d Cir. 1990)); *see also Riley v. DeCarlo*, 532 F. App'x 23, 26 (3d Cir. 2013) (per curiam).

Here, Plaintiff alleges that, for two years, Defendant Powell deprived Plaintiff basic hygiene products, such as shampoo, toothpaste, toothbrush, and dental adhesive, which prevented Plaintiff from using his dentures to eat. Plaintiff alleges that Powell withheld these hygiene products for no justifiable reason other than to harm Plaintiff. These allegations, if true, may be sufficient to support an Eighth Amendment violation. *See Paladino v. Newsome*, Civil No. 12-2021, 2013 WL 3270987, *10-11 (D.N.J. Jun. 27, 2013) (finding that 18 month deprivation of hygiene supplies, such as toilet paper and soap, was sufficient to state an Eighth Amendment conditions claim). Therefore, this claim is allowed to proceed at this time against Defendant Powell.

C. Denial of Medical Care Claim

The allegations set forth in the amended Complaint predominantly involve accusations that Defendants, Dr. Ahsan, Dr. Pease, and Rutgers University Behavioral Healthcare, denied and/or delayed necessary medical care for the treatment of Plaintiff's MRSA infection without medical justification.

A convicted prisoner, such as Plaintiff, bringing a claim for denial of reasonable medical care under § 1983 must demonstrate "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (evaluating prisoner claims under the Eighth Amendment). Thus, to establish an Eighth Amendment violation, Plaintiff must demonstrate: (1) a serious medical need; and (2) that the defendants were deliberately indifferent to that need. *See Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999); *see also Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004). A medical need is serious if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Jackson v. Ivens*, 565 F. App'x 115, 117 (3d Cir. 2014) (citation omitted). Deliberate indifference typically may be established by a prison official "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* (citing *Estelle*, 429 U.S. at 104–05). In other words, "[a] prison official acts with deliberate indifference to an inmate's serious medical needs when 'he knows of and disregards an excessive risk to inmate health and safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists.'" *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (quoting *Farmer*, 511 U.S. at 837); *accord Ordonez v. Yost*, 289 F. App'x 553, 555 (3d Cir. 2008) ("deliberate indifference is proven if necessary medical treatment

16

is delayed for non-medical reasons"); *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993) (facts plausibly showing a denial of prescribed medical treatment or a denial of reasonable requests for treatment that results in suffering or risk of injury state a viable claim).

However, "claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'" *Rouse*, 182 F.3d at 197; *Estelle*, 429 U.S. at 105 (noting that "in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind'"). "Deliberate indifference, therefore, requires obduracy and wantonness, which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk." *Rouse*, 182 F.3d at 197 (internal citations and quotations omitted). Courts "will generally not find deliberate indifference when some level of medical care has been offered to the inmate." *Christy v. Robinson*, 216 F. Supp.2d 398, 413–14 (D.N.J. 2002). *See also DeJesus v. Correctional Medical Services, Inc.*, --- F. App'x ----, 2014 WL 3734561, *2 (3d Cir. Jul. 30, 2014) (holding that "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law").

The Court finds that Plaintiff's extensive allegations concerning the delay and lack of treatment for Plaintiff's diagnosed MRSA, a serious medical need, are sufficient at this time to allow this claim to proceed against the medical Defendants, Dr. Ahsan, Dr. Pease, and Rutgers University Behavioral Healthcare. While there appears that Plaintiff received some treatment for his condition, Plaintiff's allegations, if true, tend to show that the medicals Defendants were

consciously indifferent to Plaintiff's complaints of escalating pain and resulting disabilities for a substantial period of time without justifiable medical explanation.

D. Supervisor Liability

It has been long established that claims based solely on the theory of *respondeat superior* are facially deficient. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009); *see also Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1027 (3d Cir. 1991); accord *Solan v. Ranck*, 326 F. App'x 97, 100–01 (3d Cir. 2009) (holding that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*"), *cert. denied*, 558 U.S. 884 (2009).

In his amended Complaint, Plaintiff's sole allegation against Defendant Stephen D'Ilio is based on a general claim of supervisor liability; namely, that as Warden at NJSP, D'Ilio "manages daily operations" and "executes [ ] policies." (ECF No. 3-4, Am. Compl. at ¶ 9.) Without any factual allegations showing D'Ilio's personal involvement in the alleged wrongs asserted by Plaintiff in his amended Complaint, this action must be dismissed without prejudice as against Warden D'Ilio.

E. Application for Appointment of Counsel

On August 4, 2014, Plaintiff filed a request for appointment of counsel. (ECF No. 4.) Indigent persons raising civil rights claims have no absolute constitutional right to counsel. *See Parham v. Johnson*, 126 F.3d 454, 456–57 (3d Cir. 1997). In determining whether to appoint counsel, a court considers the following: (1) the plaintiff's ability to present his or her own case; (2) the complexity of the legal issues; (3) the degree to which factual investigation will be necessary and the ability of the plaintiff to pursue such investigation; (4) the amount a case is likely to turn on credibility determinations; (5) whether the case will require the testimony of

18

expert witnesses; and (6) whether the plaintiff can attain and afford counsel on his own behalf. *See Tabron v. Grace*, 6 F.3d 147, 155–56, 157 n. 5 (3d Cir. 1993); *see also Cuevas v. United States*, 422 F. App'x 142, 144–45 (3d Cir. 2011) (per curiam) (reiterating the *Tabron* factors). Applying these factors to this case, the Court will deny Plaintiff's request for the appointment of counsel without prejudice at this time. Plaintiff demonstrates sufficient capabilities in stating his claims and pursuing this action on his own to date. Moreover, the claims are not overly complex. However, the Court will allow Plaintiff to renew this application as this case proceeds and where Plaintiff can demonstrate that discovery needs, medical records, and retention of expert opinion would require the assistance of counsel.

## V. CONCLUSION

For the reasons set forth above, this action is dismissed without prejudice, in its entirety, as against Defendant Stephen D'Ilio, pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1). In addition, Plaintiff's denial of access to the law library claim, asserted against Defendant Burack, also is dismissed without prejudice for failure to state a claim at this time, pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1). However, Plaintiff's Eighth Amendment claims asserting unconstitutional conditions of confinement and denial/delay of medical care shall proceed at this time against the remaining Defendants, Powell, Dr. Ahsan, Dr. Pease and Rutgers University Behavioral Health Care. Finally, Plaintiff's application for

appointment of counsel (ECF No. 4) is denied without prejudice at this time.   An appropriate

order follows.


_Mashipp_
_____
MICHAEL A. SHIPP
United States District Judge

Dated: 2/6/15